and INVITROGEN Corporation. Mr. Kelly. Thank you. Good morning. Adam Kelly for the Plaintiff Appellant and CELSIS IN VITRO, Inc. This appeal is the denial of a preliminary injunction addressing an alleged design-around process of defendants' currently enjoined process, which is the subject of pending appeal 10-1547. In denying the injunction, the District Court abused its discretion when it misconstrued the term density gradient fractionation in Claim 1 and imported that term into Claim 10. This improper denial severely disrupted the status quo by permitting a large competitor to return to the market and continue inflicting additional reparable harm on the much smaller CELSIS. We pray for this Court to correct this injustice by vacating the denial and restoring the status quo by instructing the District Court to enter a preliminary injunction because we have met our burden to show the second preliminary injunction as appropriate. Turning to the central issue on appeal, claim construction, this Court owes no deference to either the District Court's construction of density gradient fractionation in Claim 1 or its decision to affirmatively import that positive limitation into Claim 10. Let me ask you a question. The claim chart, the only claim chart I could find in the record is at A10013 at the very last page of the Volume 3 of the appendix. It's unclear whether that's from the first preliminary injunction proceeding or the second. Volume 3, the last page. There's so much that's super confidential in this case, it's kind of hard to follow some of it. But this claim chart was from which proceeding? This claim chart is from the, this claim chart is actually from the claim construction brief, this claim construction briefing which followed the second preliminary injunction. We had submitted a claim chart with our moving papers which was Exhibit E to Dr. Strom's declaration and that can be found in the record at I believe A5989 in that range. All right. So, but here you define density gradient as both a distribution of cells within a medium based on their density and the density of the medium. Correct, Your Honor. Okay. And so are you not at that point referring to the medium itself as part of a critical aspect of the phrase density gradient? No, Your Honor. What we're referring to is that the medium itself needs to be an isotonic fractionation buffer that satisfies two functions. One, it has to be able to ensure cell health because as the cells are centrifuged, they need to be able to retain their viability. And the second function is to enable those hepatocytes, the viable hepatocytes, to separate by their density from the non-viable hepatocytes. So they will form a density gradient. In other words, the less dense hepatocytes ranging to the more dense which are the viable hepatocytes. But the medium itself has to have some level of density to accomplish this, correct? I believe they're partially, Your Honor. There are some types of density gradient media which have a very high density. And there are other types of medias that have a density that's near that of water. But the more efficient types would be our preferred embodiment, which would be those that would have a percol in it. But you can certainly separate viable from non-viable hepatocytes with having a density that's near or above the water, the density of water. So turning to Claim 1, and I'll continue on with Your Honor's discussion of density gradient fractionation, the District Court misconstrued density gradient fractionation to require a density gradient medium. The plain and ordinary meaning for this term is the separation of hepatocytes into fractions by their density using centrifugal force. So again, the two basic components are the buffer and the centrifugal force. Do you define density gradient fractionation and density gradient centrifugation differently? I mean, you use them interactively. You keep going back and forth between them, and yet there seems to be a difference between them. Your Honor, there is a difference between density gradient fractionation, and we'll call it centrifugal separation. Oh, that's easier. I could have done that. But I think the difference between Claim 1 and Claim 2 are instructive on this point. So the record A54, if we turn to Claim 2, Claim 2 recites density gradient fractionation comprises density gradient centrifugation. So let's stop there. So the way we view density gradient fractionation is an umbrella term that embraces many different techniques for separating viable for non-viable hepatocytes based on their density. Here in Claim 2 is one of those subset techniques, density centrifugation. But the claim continues to recite a type of colloidal silica particle. That colloidal silica particle would be added to the isotonic fractionation buffer, and that will be the media that will be used to practice this particular subset technique, density centrifugation, in Claim 2. And we submit that this Claim 2 recites the same preferred separation technique that we find on Column 10 of the patent. That's at page A49. On Column 10, Line 54, it discloses a 30% percol isotonic fractionation buffer. That's very instructive because what we know is that this particular isotonic fractionation buffer that's recited here has an additional component to it, and that is 30% percol. The isotonic fractionation buffer could have been by itself. It could have had additional elements to it. But this particular one was 30% percol. And further to your Honor's question about the difference between density gradient fractionation, and actually rather dissimilarity of density gradient fractionation and how it covers other subset techniques, Column 4 of the patent, at A46, at Line 45, it recites density gradient fractionation, open perin, especially percol density centrifugation, closed perin. So what we have there is another recitation of what our preferred embodiment is, which is to use a separation technique with the addition of percol. But again, it's a preferred embodiment. But I still don't understand, I mean you're still not answering my question about the distinction between the centrifugation and fractionation. You're not, are you using those interchangeably? You go back and forth both in the patent and your brief, and yet there are different phrases, and so the question is are you assuming that they are identical? No, Your Honor, they're not identical. We view fractionation as a general term of splitting the cells apart. Using centrifugation, a centrifuge, is one common technique for achieving that fractionation. So notably, nowhere in the patent specification is there any definition for density gradient fractionation, which requires a density gradient medium, nor is there any disavowal of techniques that do not use a density gradient fractionation. We discussed at A-49 the disclosure of an isotonic fractionation buffer. There's an additional embodiment that's disclosed at A-51. And in the prosecution history, there's no clear and unmistakable disavowal of any form of density gradient fractionation without a density gradient medium. And the opinion testimony that we presented squarely supports our proposed construction. Drs. Gandhi and Strom opined from the correct standard of a person of ordinary skill in the art. The lead witness that we had was Dr. Strom. He carefully analyzed the six persons of ordinary skill in the art under the Diacho-Sanko case. That's found at A-59, 89-90, paragraphs 29-33. Notably, the person of ordinary skill in the art here is one who's working in the field of primary hepatocytes. It's not a person who is in the field of cell separation. Again, if we look at the context of this patent, it's for someone who's working in the field of primary hepatocytes. Didn't Dr. Strom himself say that fractionation requires at least some compound of sufficient density to cause the separation? And I know you say that that can be close to water, but it can't be water, can it? Your Honor, Dr. Strom did say that. And it was in the context of the first preliminary injunction. So if we go back in time to the first preliminary injunction last August, there the accused process was essentially the defendants practicing the preferred embodiment of our patent. There was no formal claim construction rendered by the district court, because the district court felt that it didn't need to. And also the defendants... So his expert view of one of skill in the art about what the process is, is different depending on the context? No, well I believe that the context in which he was rendering that opinion was looking at a separation technique that was being practiced by the defendants that involved a percol density separation. All right, so you're saying that his reference to needing a compound of sufficient density to separate the cells in order to constitute density gradient fractionation, that he didn't really mean that? That he meant something different? He only meant that if that's what the defendant was practicing? No, I'm not saying that he was meaning something different. I'm saying he was referring to the first preliminary injunction, where they were practicing the preferred embodiment of percol density centrifugation. But for the preliminary injunction, it's clear he felt that more likely than not, they would avoid infringement by their redesign, by having changed the medium. And it was a significant change, was it not? Well, Your Honor, Judge Shader did hold that, but we believe that the change was not significant. At the close of the first preliminary injunction hearing, we read the judge's comments as essentially inviting the defendants to design around our patent in three ways. Density gradient fractionation, the not plated step, and without requiring a density gradient step. So not surprisingly, the three non-infringement defenses that we have for the second preliminary injunction are those same three defenses. We don't, when we view that each of those changes that are so-called in the new process, really push the envelope on pushing a fraud on our patent. What we have here is that the plaintiff had invented a novel way of twice cryopreserving these hepatocytes, where for two generations, no one in the yard had thought that you could twice cryopreserve these hepatocytes and sustain any level of viability that would be desirable to researchers. That was the invention. The separation technique that's presided in the patent of density gradient fractionation from the perspective of a person of ordinary skill in the yard at this time embraced many different separation techniques. There's no dispute between the parties that there were many known separation techniques at the time for separating viable for non-viable hepatocytes. All right, let's hear from the other side and we'll save your rebuttal time. Mr. Fitts. Thank you, Your Honor. This court should affirm the district court's denial of a preliminary injunction against LTC's new method because the district court did not abuse its discretion in interpreting Claim 10 and density gradient fractionation and in finding that life technology switch to alliteration is not the same as or even equivalent to density gradient fractionation. I want to turn first to the court's construction of density gradient fractionation. The court correctly construed density gradient fractionation to require a density gradient to fractionate hepatocytes. That construction also happens to be, as Judge Malley pointed out, consistent with Dr. Strom's proposed construction from the language itself, which recites that a density gradient is an essential element of the claim process. But doesn't your revised process also achieve a density gradient fractionation? No, it does not, Your Honor. How else could it separate the molecules? The alliteration process does not rely on a density gradient to separate hepatocytes, nor does it use a density gradient medium to separate the hepatocytes. You're saying it relies on size? I'm sorry? You're saying it relies on the size rather than the density? It does, primarily. But the critical component to the new process is instead of using a density gradient medium to separate hepatocytes based on their density, it uses a fluid counterflow force in a direction opposite the centrifugal force in a liquid that does not have a density gradient component, nor form a density gradient. And that evidence was supported by the testimony of Kirsten Amrall, Life Technologies lead scientist, as well as the opinion witnesses that Life Technologies put before the court. How do you define density gradient component? So percol, for example, is a density gradient component. But it's not the only one. It's not, agreed. And the court construed density gradient fractionation in a way that embraced the use of any density gradient medium. But the critical component is that inherent in the density gradient medium is its ability to form a gradient. The medium itself forms a gradient. Even in the absence of cells, it'll form a gradient. And it's the separation of, say, a gradient from 1 to 10, let's just say. The hepatocytes will then move based on the centrifugal force or flotation forces to the point in the medium where their density matches the density of the medium. So if a non-viable hepatocyte, for example, has a density of 1, the hepatocyte will migrate to the point in the density gradient where it's in equilibrium. So is the density gradient medium anything with a density greater than water? It has to be just more than that, though, Your Honor. An important feature of... Just more than what? It's not just that the density of the medium is greater. It's that the component, the particle, or whatever the medium is comprised of, has to have this ability to form a density gradient. So inherent... It's not just that you can pull any ingredient off the shelf, like salt, and make your density of your solution a density gradient. Sucrose, okay. Sucrose can do it, yes, Your Honor. But sucrose has the ability, inherent ability, to form a density gradient. Okay. With respect to your infringement position, would your position be that there's no infringement regardless of how you define density gradient medium, or regardless of whether the density gradient medium is a component? In other words, is your counterflow enough to separate you from their system? Yes. So there's... Let me just... I think I can try to unpack that a little bit. So the claim process requires the use of a density gradient medium to form a gradient, and the use of centrifugal force to pull the cells through the gradient, or maybe to move them in the other direction, depending on the gradient, the density of the gradient. Life Technologies' new process does not use a density gradient medium. That the medium is, in fact, has the same... Effectively the same density as water, which is less than the density of a non-viable hepatocyte. So it just defies comprehension that a medium that has a density greater than even the thing you're trying to separate could actually separate the hepatocyte. So that's the first point. We don't use a density gradient medium or a medium that forms a density gradient. The second component is we rely on something manifestly different. The system itself, intrinsic in the system, is the use of a fluid counterflow force. So you can think of it as... And this is diagrammed in Figures 2 and 3 in our brief, but you can think of it as a chamber. And on one side, the fluid is going in, which forms a counterflow force in one direction, and in the other direction is a centrifugal force. And if you get those just right, the hepatocytes will basically stay suspended in the separation chamber. But what happens is when you change one or the other, the counterflow will cause drag forces on the cells that cause them to separate in a fundamentally different way than is used during density gradient fractionation. So that's an independent non-infringement argument? Both of those. Both of those are independent non-infringement arguments. Okay. And back to, you said that the district court did not limit the patent to the perverted embodiment? That's correct, Your Honor. On page A5, for example, Your Honor, what the district court concluded was that density gradient fractionation requires the use of a density gradient, and thus the use of a density gradient medium. And in parentheses, 30 percent percol, for example. So the 30 percent percol is the embodiment that's described in Claim 2, which Mr. Kelly alluded to. What the district court didn't do is limit density gradient fractionation to the use of only percol, which is what Mr. Kelly was arguing. What the district court did was construe density gradient fractionation within the scope of Claim 1 to encompass all density gradient mediums, the use of fractionation with any density gradient medium. Since I'm on that point, I want to respond to one point that Mr. Kelly raised, and that is that the use of any isotonic fractionation buffer is sufficient to use for density gradient fractionation. That's fundamentally technically incorrect. An isotonic fractionation buffer could be a buffer that, as Your Honor pointed out, a medium that has a density similar to water, that is simply not capable of fractionating hepatocytes. And the reason the specification discloses over and over and over again the use of a density gradient medium is because you cannot do density gradient fractionation without a medium that forms a density gradient. You won't see any disclosure in the specification of the use of an isotonic fractionation buffer alone. And there was no dispute by the party's experts that the specification discloses only the use of density gradient medium. The party's experts agreed that the only disclosure in the specification is of the use of a density gradient medium, not merely the use of any isotonic fractionation buffer. Furthermore, there's nothing in the prosecution history to suggest that the construction, that the court's construction of density gradient fractionation was incorrect. Solstice and the examiner repeatedly, and without exception, described density gradient fractionation using the density gradient medium percol. There's no disclosure in the prosecution history suggesting or even alluding to the use of anything other than a density gradient medium to perform density gradient fractionation. And that's just- Are you arguing that it rises, though, to a disavowal of anything other than percol? No, Your Honor. And as this court has held in Phillips and in Nystrom, a clear disavowal is not required to appropriately construe the claim terms. But what you do see here is a consistent and uniform description of density gradient fractionation processes that only use a density gradient medium specifically percol. Okay. Can we move to the DOE issue? Yes, Your Honor. Clearly, the district court was somewhat confused in its discussion of the elements that he was to consider here. Isn't that at least true? I think there was some imprecision at most in the court's order. But it's clear from the analysis over the court's eight-page opinion that he really evaluated the doctrine of equivalence through, in many ways, through vitiation, through the insubstantial differences test, and from the triple identity test. And what Your Honor is referring to, I think, is the court's reference to the function of the counterflow to separate the hepatocytes. But what's clear from the court's overall analysis is that what the court was saying is that the way elutriation separates hepatocytes is by using a fluid counterflow. So the way elutriation functions is by using a fluid counterflow to separate hepatocytes, not a density gradient medium. But the result is, is your sense that that issue was resolved at this stage as well, and along with the denial of the preliminary injunction, or is that awaiting further development at the district court? No, the district court held unequivocally in our view that life technology's use of elutriation does not infringe either literally under the doctrine of equivalence. It did not literally infringe. Nor under the doctrine of equivalence. Since I'm on the doctrine of equivalence, let me just circle back. I mentioned that the court evaluated equivalence in three ways. I think you also see from the court's opinion that the only way a non-gradient process like equivalent to density gradient fractionation is by improperly vitiating density gradient from the claim language. A process of elutriation is not necessarily non-gradient, is it? Does not use a density gradient. It doesn't use a density gradient medium. However, the dispersion of the product is according to density, is it not? There's no evidence in the record showing that elutriation results in a density gradient. There's no evidence. We're still dealing with a motion for preliminary injunction. That's right, Your Honor. So we're talking about likelihoods. That's right, Your Honor. Not final decision. That's right. And in fact, for purposes of literal infringement and the doctrine of equivalence, what this court has to make a test to do is determine whether there were clearly erroneous factual findings by the district court based on the record that was in front of them. And we submit, and it's pervasive in our brief, that there was no error. There was no basis for this court to conclude that the district court made clearly erroneous factual findings with respect to either literal infringement or the doctrine of equivalence. We're still dealing with likelihoods so that it doesn't have to go that far. Absolutely, Your Honor. I agree. Let me just circle back to the doctrine of equivalence one more time. The other evaluation that the court made was through a determination that allutriation is not insubstantially different from density gradient fractionation. And there was more than enough evidence in the record from which the court could construe that. As we've already hit, allutriation doesn't use a density gradient medium and instead relies on a fluid counterflow force to cause the separation of hepatocytes. Because allutriation uses a different mechanism of separation and different applied forces, it necessarily uses different equipment and different media. And there's no dispute about that. And we cited that in our brief. Furthermore, all of the literature consistently describes allutriation and density gradient fractionation as being two distinct processes. There's not a single piece of literature in the evidence that suggests otherwise. Finally, because density gradient fractionation and allutriation have distinct advantages and disadvantages, the processes are used frequently in combination. And if they were truly equivalent, you'd expect them to be used interchangeably or substitutes for one another. And again, that's just not what the record shows. I'm going to turn now to the court's construction of Claim 10, unless there are questions about infringement. Okay. Okay, thank you. Claim 10 recites the use of a multi-cryopreserved hepatocyte preparation that has been made by a specific process. And that includes, as expressly recited in Claim 10 itself, the steps of freezing and thawing the hepatocytes twice, not subjecting them to plating during between the first and the hepatocytes for a second time, to obtain a preparation that has greater than 70% viable hepatocytes. The district court merely clarified that the process recited also has to use a density gradient fractionation step after the first thaw. That construction was mandated by the claim language, by the prosecution history, and by the specification. With respect to the prosecution, there was simply no dispute between CELCIS and the examiner during prosecution that all of the claims required that the multi-cryopreserved hepatocyte preparation have to be made using density gradient fractionation after the first thaw. Between CELCIS and the examiner, they said at least a dozen times that the process for making that hepatocyte preparation has to use a first density gradient fractionation step. In dealing with the rejections based on obviousness, written description, and non-enablement, CELCIS repeatedly, and without exception, stated that the hepatocyte preparation used in Claim 10 has to be made using a density gradient step after the first thaw. We've identified in our brief on pages 12 through 15 the prosecution history, and what you will see from that is that there is no suggestion, no indication at all, that CELCIS had contemplated the use of any cell separation process other than density gradient fractionation after the first thaw. But there was no actual amendment in response to any of these rejections. These were just explanations. Is that right? There was an amendment to include the addition of the limitation without requiring a density gradient step after the second thaw. And when CELCIS added that amendment, they added it to overcome an obviousness rejection. And what they told the examiner is, you don't need to do a second PERCOL density gradient centrifugation step to get the claim viability. So when CELCIS said that, and they added this limitation, what the court properly concluded from that language, that claim language, in light of CELCIS' statement about what that language meant during prosecution, the court logically concluded that if you're not going to do a second density gradient step, logically there's got to be a first. Do you have any more questions? Yes, one last question. You sent us notice of the PTO's office action. What are we supposed to do with that? So I believe it was the appellants, Your Honor. But what the office action establishes is that claim 10 has been finally rejected as invalid. It's not over. But I think we will figure out how much notice to take of what was happening. It's not final. Correct, Your Honor. Let me just make one point on that, Your Honor. I'm aware of no decision by this court that has granted or upheld a preliminary injunction based on a claim that has stood finally rejected during re-examination. What this court's precedent has said is that that rejection in the concurrent re-examination that CELCIS issued at least creates a substantial question of validity about the claim. Because there is a substantial question about the validity of claim 10, putting aside all the infringement issues, that alone is sufficient to reverse the district court's finding. Well, I think it's fair to say that no one has asked us to take a definitive action based on a less than final resolution of an issue in the office. I agree, Your Honor. Okay. Thank you. Any questions for Mr. Fintz? Any more questions? No. Okay. Thank you, Mr. Fintz. Mr. Kelly. Thank you, Your Honor. I'd like to make a couple of quick points. Number one, I'd like to return to Your Honor's question about a density gradient medium. And a density gradient medium could itself form a density gradient upon the application of centripetal force. What we just heard from Life Technologies Council is that in his discussion of the doctrine of equivalence, the way centripetal elutriation works with inside that chamber is when the epatocytes will separate by their density within that chamber, at which point a gradient will be applied, which is a gradient applied by a counterflow of fluid. And it's that gradient that will then pick off epatocytes as they've aligned by their density. There's no dispute between the parties that centripetal elutriation is capable of separating cells by both size and density. That's reflected in the product literature to operate that equipment. The real crux of Life Technologies' argument is that somehow centrifugal elutriation separates epatocytes primarily on the basis of size. But in the context of, among other things, the prosecution history and the limitations of your claims in view of the prior art. And again, we're talking about likelihoods. You want us to conclude that it's more likely than not that you would prevail rather than what the trial court thought in distinguishing elutriation in view of the various representations in the patent, which are unequivocal, it seems to me, about using the medium. Well, Your Honor, we believe we've demonstrated a likelihood of success on the merits by demonstrating both literal and equivalent infringement. We believe that we've shown that it's more likely than not now that we'll show by a preponderance of the evidence at trial on the issue of infringement. We already have demonstrated a likelihood of success on the issues of irreparable harm, balance of the harms, and the public interest, all of which were found in our favor for the first preliminary injunction. The parties are similarly situated here for this second preliminary injunction. We believe that those findings should apply towards a grant of a second preliminary injunction in this case. So your view is that these issues have not been resolved definitively? Which issues, Your Honor? The issues of infringement, validity, scope. We believe that we have sufficiently briefed to allow this court to find that it's more likely than not that we've met our burden to show infringement. And I agree with that. The question is, what happens now? You go back to trial, is that right? Yes. The case would still be set for trial. So regardless of what happens on this particular appeal, the case is still set for trial. Actually, the case is not set for trial. But we don't have a trial date yet. But we would proceed in that direction. OK. Anything else you want to tell us? No, Your Honor. We'll rest on our briefs. Questions? Any more questions? Thank you. The case is taken under submission. Thank you, Mr. Kelly and Mr. Fist. All rise. The ad hoc report is adjourned until tomorrow morning at 10 a.m.